LAW OFFICES
MORGAN, LEWIS & BOCKIUS LLP
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 309–6000

LAW OFFICE
DONOGHUE, THOMAS, AUSLANDER & DROHAN
2517 ROUTE 52
HOPEWELL JUNCTION, NY 12533

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————X

ARLENE M. KRIKELIS,

                  Plaintiff,

             -against-

VASSAR COLLEGE AND ARAMARK
CORPORATION

                 Defendants.

———————————————————————————X

Civil Action No. 7:06-cv-04203-CM-MDF

**ELECTRONICALLY FILED**

## RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF THE JOINT MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS ARAMARK CAMPUS SERVICES, INC. AND VASSAR COLLEGE

      Pursuant to Local Civil Rule Pursuant to Rule 56 of the Federal Rules of Civil

Procedure, Local Rule 56.1 for the United States District Court for the Southern District

of New York, and the individual rules of this Court, Defendants Vassar College

("Vassar") and ARAMARK Campus Services, Inc., incorrectly sued herein as

ARAMARK Corporation ("ARAMARK"), respectfully submit this Statement Of Material

Undisputed Facts in support of their Motion for Summary Judgment.

## I.        PLAINTIFF'S EMPLOYMENT WITH VASSAR COLLEGE

1.        Plaintiff Arlene Krikelis ("Plaintiff") has been employed by Defendant Vassar College ("Vassar") at its campus dining facilities since 1987. (Deposition of Plaintiff Arlene Krikelis taken on October 26, 2006 and November 3, 2006 ("Pl. Dep.") at 81-82).[1]

2.        Vassar contracts with ARAMARK Campus Services, Inc. ("ARAMARK") to serve as the food service provider on its campus.   (Compl. ¶¶10-11; Affidavit of Maureen King dated February 21, 2007 ("King Aff." ¶4) (Ex. X)). ARAMARK's managers supervise the Vassar employees working at the main dining hall, the All Campus Dining Center ("ACDC") and a smaller dining hall, the "Retreat." (Pl. Dep. at 146, 303; Deposition of Maureen King taken on December 13, 2006 ("King Dep.") at 9, 24).

3.        The five positions held by Vassar food service workers at ACDC (from least to most senior) are:  Kitchen Worker, Chef's Helper, Cook, Assistant Chef and Head Chef.   (King Aff. ¶5).  Chef's Helpers, Cooks and Assistant Chefs have varying levels of responsibility for the preparation of foods in the kitchen.  (Pl. Dep. at 148-50).  A Chef's Helper receives discrete food preparation assignments with significant supervision and instruction.  (King Aff. ¶6).  The Assistant Chef position is very similar to that of a Cook, but Assistant Chefs are "responsible for the entire recipe from start to completion, without any instructions or any supervision at all."  (Pl. Dep. at 149-50).  The Head Chef position is the top position.  (Pl. Dep. at 150).

---

[1]        Exhibits in support of this Statement of Facts are contained in the Appendix filed herewith.  Excerpts of the deposition transcripts for Plaintiff, Maureen King, Bruce Harms, Theresa Bettencourt, Diane Dalton, Anna Reeves, Donald Nervik, Sarah Hoger and Kim Collier are included in the Appendix as Exhibits N through V, respectively.

4.      Plaintiff was initially hired as a Kitchen Worker at ACDC.  (Pl. Dep. at 81, 146, 303; King Dep. at 9).  After a series of promotions, she now works as an Assistant Chef.  (Pl. Dep. at 81-84, 96-97).  Throughout her employment, Plaintiff generally has been assigned to work at ACDC, although she occasionally worked overtime at the Retreat.  (Pl. Dep. at 146-47, 303-04; King Dep. at 9).  Plaintiff has never been subjected to discipline.  (King Aff. ¶17).

5.      At all times relevant to Plaintiff's Complaint, Maureen King, the Senior Director of Dining, was the ARAMARK manager in charge of all food services at Vassar.  (King Dep. at 6, 8).  A number of ARAMARK managers reported to Ms. King. (King Dep. at 8; Deposition of Bruce Harms taken on November 20, 2006 ("Harms Dep.") at 6; Deposition of Anna Reeves taken on December 15, 2006 ("Reeves Dep.") at 10; Deposition of Diane Dalton taken on December 15, 2006 ("Dalton Dep.") at 11; Deposition of Terri Bettencourt taken on November 21, 2006 ("Bettencourt Dep.") at 9). Bruce Harms, Associate Food Service Director, was responsible for preparing menus, scheduling, hiring, budgeting, hearing first step grievances and generally ensuring smooth operations.  (Harms Dep. at 5; Pl. Dep. at 93).  Terri Bettencourt, Assistant Director, was responsible for scheduling, managing the cashiers, running the Java City kiosk, running large scale catering events, overseeing line presentation and marketing of how food was presented to the customers, and supervising the staff.  (Pl. Dep. at 93; Bettencourt Dep. at 8).  Diane Dalton served as Assistant Director prior to 2004 and she was responsible for managing people and overseeing the "front of the house" or servicing line.  (Dalton Dep. at 5-6, 9).  In 2004, Ms. Dalton became the Production Manager and was responsible for purchasing food and beverage items, doing inventory and working in

the kitchen.  (Pl. Dep. at 93; Dalton Dep. at 5).  Anna Reeves, Manager, was responsible

for overseeing the employees and making sure that everything runs properly.  (Reeves

Dep. at 5, 6-7).

    6. Vassar's food service employees, including Plaintiff, are members

of a collective bargaining unit covered by a collective bargaining agreement between

Vassar and Local 200United of the Service Employees International Union, AFL-CIO,

CLC (the "Union").  (King Dep. at 25).  Employees at ACDC and the Retreat are subject

to the same pay rates and receive the same benefits.  (Pl. Dep. at 304).

    7. Since 2003, Plaintiff has served as a shop steward.  (Pl. Dep. at 57-

58, 83, 98).

## II.  THE ALL CAMPUS DINING CENTER

    8. ACDC operates seven days a week during the academic year.

(Harms Dep. at 15).

    9. ACDC has a very large kitchen that is separated from the servery,

which is where the students eat, by a wall with doors.  (Deposition of Donald Nervik

taken on November 15, 2006 ("Nervik Dep.") at 14-15.  The kitchen has a number of

stoves, ovens, work tables, and walk-in refrigerators.  (Nervik Dep. at 14).  Food is

generally prepared in the kitchen and then brought out into the servery.  (Nervik Dep. at

16).  The servery is divided up into different food stations that are spaced apart from each

other to prevent the students from being crowded into one area.  (Nervik Dep. at 15-16).

    10. ACDC has two shifts.  (Harms Dep. at 16).  The first shift runs

from 6:00 a.m. to 2:30 p.m.  (Pl. Dep. at 430-431; Harms Dep. at 16).  The second shift

runs from 12:30 p.m. to 8:30 p.m.  (Pl. Dep. at 430-31; Harms Dep. at 16).  Two

ARAMARK managers are responsible for supervising the first shift food service workers

during the week.  (King Aff. ¶7).  Two ARAMARK managers are responsible for

supervising the second shift food service workers during the week.  (King Aff. ¶7).  On

Saturdays and Sundays, one ARAMARK manager is responsible for the first shift and

one ARAMARK manager is responsible for the second shift.  (King Aff. ¶7).

11.     Because students often eat out on weekends, Saturday and Sunday

are the least busy days of the week, so there is only one manager on duty for each shift.

(Harms Dep. at 19).

12.     During the summer, the kitchen staff is reduced to approximately

twenty employees.  (King Dep. at 55; Harms Dep. at 15).  During the months of May,

June and July, the food service employees go out on intercession break and then they

return to the kitchen in August.  (Pl. Dep. at 77).

**III.     VASSAR AND ARAMARK'S ANTI-HARASSMENT AND ANTI-
       DISCRIMINATION POLICIES AND TRAINING**

13.     Vassar has maintained an anti-discrimination and anti-harassment

policy throughout Plaintiff's employment.  (Ex. A, at p. 2; Pl. Dep. at 102, 387-89, 494).

This policy provides, in relevant part: "A member of the College community who

believes he or she has been the victim of discrimination or harassment should contact the

Office of Equal Opportunity and Affirmative Action . . . or the Faculty Director of

Affirmative Action."  (Ex. A, at p. 3).

14.     The policy further provides that any such complaints will remain

confidential and that the employee shall not be subjected to any retaliation.  (Ex. A, at p.

3).

15.     Plaintiff acknowledges that she knew about Vassar's anti-

discrimination and anti-harassment policy and that she saw it posted on a bulletin board.

(Pl. Dep. at 102-03, 494).  She also recalls that Vassar held training for all dining services staff on anti-discrimination and anti-harassment policies at some point before 2004.  (Pl. Dep. at 103-04).  This training covered a number of topics, including "harassment on the job, regular harassment, differentiating between sexual harassment, [and] unwanted situations."  (Pl. Dep. at 104).  This training included role playing.  (Pl. Dep. at 104).

16.     Ms. King recalls that in September 2002, she held a meeting with employees in which she reviewed ARAMARK's Code of Conduct and Vassar's sexual harassment policy.  (King Dep. at 36, 130-31; Ex. B).  During that meeting, Ms. King emphasized the importance of developing an atmosphere of respect and dignity.  (Ex. B; King Dep. at 37).

17.     Plaintiff also advised employees about discrimination matters in her role as a shop steward.  For instance, in 2004, she advised an employee with a discrimination concern to contact Vassar's Affirmative Action Officer, Belinda Guthrie, to investigate his complaint.  (Pl. Dep. at 100-02).

## IV.     PLAINTIFF'S FRIENDSHIP WITH CO-WORKER DONALD NERVIK

18.     Plaintiff has known Donald Nervik, a fellow Vassar dining service employee, since she commenced employment at Vassar.  (Pl. Dep. at 159, 163; Nervik Dep. at 8).

19.     Mr. Nervik has worked for Vassar College for twenty five years and in ACDC for nineteen years.  (Nervik Dep. at 8).  In 1981, Mr. Nervik was hired by Vassar as an Assistant Chef.  (Nervik Dep. at 8).

20.     Plaintiff and Mr. Nervik developed a friendly co-worker relationship in the 1990s when they both worked in the kitchen at ACDC.  (Pl. Dep. at 160, 292, 488-89; Nervik Dep. at 43).  For instance, Plaintiff had dinner at Mr. Nervik's

house with other co-workers, took care of his cats, and helped around his house.

Sometimes Mr. Nervik came over and had coffee with Plaintiff and her husband, Heinz.

On occasion, Plaintiff and Mr. Nervik also drove to work together.  (Pl. Dep. at 160-61,

292, 489; Nervik Dep. at 112-13).

21.     In the course of their friendship, Plaintiff allowed Mr. Nervik to

put his arm around her shoulders.  Plaintiff also allowed other male employees to hug

her.  (Pl. Dep. at 496-98; Nervik Dep. at 125).

## V.     ARAMARK PROVIDES AN ACCOMMODATION FOR PLAINTIFF'S HEART CONDITION

22.     In 1999, when she was a Chef's Helper, Plaintiff underwent an

angioplasty and requested light duty work as an accommodation.  (Pl. Dep. at 130).

Defendants accommodated her by allowing her to work as a cashier for several weeks in

November of 1999.  (Pl. Dep. at 130).  After returning from Christmas break, Plaintiff

resumed full duties in her regular job.  (Pl. Dep. at 130-31).

23.     In March of 2000, Plaintiff had quadruple heart bypass surgery.

(Pl. Dep. at 17, 80, 423).  Following her surgery, Plaintiff has not had any heart attacks or

suffered any relapse of her heart condition.  (Pl. Dep. at 129, 221, 504).  She takes

cholesterol lowering drugs to prevent the symptoms from returning.  (Pl. Dep. at 130).

24.     Plaintiff believes that as a result of her heart problems, she is tired

more often, it is harder for her to lift, she sometimes experiences shortness of breath, she

has a difficult time walking up and down stairs, and she has experienced pains in her

chest and arms.  (Pl. Dep. at 129-30).  However, these limitations have not prevented her

from working or performing household chores.  (Pl. Dep. at 18).

25.     Except for her request for light duty work in 1999, Plaintiff has not requested any other accommodation for her heart condition.  (Pl. Dep. at 130-31).

## VI.     IN THE SUMMER OF 2000, ARAMARK REVISES ITS MENUS TO ACCOMMODATE STUDENT PREFERENCES

26.     In the summer of 2000, Mr. Harms, the Associate Food Service Director, was temporarily assigned to work at ARAMARK's food services facility at the Olympics in Sydney, Australia.  (Harms Dep. at 5-6, 44).

27.     In Mr. Harms' absence, Ms. Bettencourt, Assistant Director, worked to revise the menus at various food stations for the Fall 2000 semester.  (King Dep. at 54; Bettencourt Dep. at 8, 40, 41).  Changes were necessary because it is important to maintain variety and introduce new food items each semester in order to accommodate student preferences.  (King Dep. at 56).

28.     Plaintiff acknowledges that menus change each semester to accommodate student preferences.  (Pl. Dep. at 203).

29.     Plaintiff alleges that when she returned to work in the Fall of 2000, her menus had changed such that her workload increased and she could not handle it.  (Pl. Dep. at 135-36, 140, 203).  According to Plaintiff, Ms. Bettencourt threatened to write Plaintiff up for refusing to do her job in September of 2000.  (Pl. Dep. at 140, 220-21).

30.     Plaintiff believes that Ms. Bettencourt was solely responsible for the menu changes.  She believes that Ms. Bettencourt purposefully increased her workload because of Plaintiff's heart condition.  (Pl. Dep. at 135-36, 137, 140, 203, 220-21).

31.     Plaintiff admits that she does not know whether Ms. Bettencourt did not like people who suffered from heart conditions.  (Pl. Dep. at 135-36).

32.     She further admits that no one ever told her that Ms. Bettencourt was taking actions against her because of her heart condition.  (Pl. Dep. at 137, 140).

33.     Rather, Plaintiff testified, "I believe that . . . [Ms. Bettencourt] did not like me.  And I believe she saw that as a way of causing me to quit my job, if she increased the work to where I couldn't handle it."  (Pl. Dep. at 136).  Plaintiff admits that she did not know whether Ms. Bettencourt modified the menus simply because Ms. Bettencourt did not like Plaintiff.  (Pl. Dep. at 142).

34.     In October 2001, Plaintiff was promoted to the position of Cook. (Pl. Dep. at 83-84, 163; Ex. C; King Aff. ¶8).  Ms. King and Mr. Harms approved the promotion.  (King Aff. ¶8).

35.     As a Cook, Plaintiff was assigned to the vegan station and responsible for preparing a vegan entrée, starch and vegetable.  (Pl. Dep. at 151).

## VII.   IN 2003, PLAINTIFF ALLEGEDLY SUFFERS VERBAL AND PHYSICAL HARASSMENT BY VASSAR CO-WORKER DON NERVIK

36.     Plaintiff alleges that her relationship with Mr. Nervik deteriorated in 2003 when he allegedly began to verbally and physically harass her.  (Pl. Dep. at 161, 489-90).  She acknowledges that Mr. Nervik's alleged harassment was not directed at her in a sexual manner.  (Pl. Dep. at 42-44, 162).

37.     According to Mr. Nervik, his friendship with Plaintiff became strained because she was "bad-mouthing" his friends, including Terri Bettencourt. (Nervik Dep. at 113, 117).  Mr. Nervik testified that after Plaintiff called Ms. Bettencourt a "fucking cunt" on one occasion and a "whore" on several occasions, he told Plaintiff, "Look, stop.  You've got to stop this.  These are my friends."  (Nervik Dep. at 113-15; see also Bettencourt Dep. at 31-33).

9

38.     Mr. Nervik also feels that Plaintiff, a shop steward, resented him for being friends with and standing up for a manager.  (Nervik Dep. at 115, 117).

39.     According to Plaintiff, Mr. Nervik "started to verbally abuse me. . . . It went on to remarks in the kitchen . . . about 'Where is my hug?'"  (Pl. Dep. at 161).

40.     Plaintiff also claims that Mr. Nervik would address her, "Hey you", "Hey, woman", "Get over here, lady", "You will do what I say", "I am your boss", and "I am the chef, you will do what I say."  (Pl. Dep. at 162, 251).

41.     Plaintiff also claims that Mr. Nervik "would tell all the men very personal items, and the whole kitchen would listen about his divorce and his wife and sexual activities."  (Pl. Dep. at 163, 166).  Plaintiff tried to keep out of earshot and asked Mr. Nervik to stop.  (Pl. Dep. at 165-66).  She could not give an estimate of how often Mr. Nervik talked about his wife, but believes it was more than once.  (Pl. Dep. at 166).  In 2003, she did not complain to anyone about this.  (Pl. Dep. at 166).

42.     With respect to alleged physical harassment in 2003, Plaintiff alleges that Mr. Nervik put his arm around her "very few times."  (Pl. Dep. at 157-58).  When he did, Plaintiff moved away from him and said that she did not want to be hugged.  (Pl. Dep. at 158).

43.     Plaintiff continued to allow other co-workers to put their arms around her and hug her.  (Pl. Dep. at 157, 158-59).  According to Mr. Nervik, Plaintiff also participated in sexual banter in the kitchen on numerous occasions.  For instance, when they saw a big zucchini in the kitchen, Plaintiff would ask, "Is this a humongodunger or is it a schlagandager?," which are slang terms for "a gigantic penis." (Nervik Dep. at 119-21).

44.     Plaintiff also claims that Mr. Nervik physically shook her on a few occasions in 2003.  (Pl. Dep. at 168, 241-43, 280-81, 294).  She testified, "The first time he shook me, we were in the kitchen and we were arguing about something.  He grabbed a hold of me, shook me, and let go of me real quick." (Pl. Dep. at 168-69).  She did not tell anyone because she "didn't take it seriously at that point."  (Pl. Dep. at 171).

45.     Plaintiff also alleges that in 2003, Mr. Nervik put his hands around her throat for a second and made a joke out of it by saying "I'd like to choke you."  (Pl. Dep. at 185-88).  Plaintiff did not say anything in response.  (Pl. Dep. at 188).  Plaintiff did not file a written complaint or grievance about this incident or notify Vassar's Human Resources Department.  (Pl. Dep. at 189).  Plaintiff did not report it to any ARAMARK manager until May 2004 at the earliest.  (Pl. Dep. at 188-89).

46.     Plaintiff also believes that Mr. Nervik removed her recipes, changed the menu or "mess[ed] around with some of the items [she] had."  However, Plaintiff admits that she does not know who was responsible for allegedly doing so.  (Pl. Dep. at 278, 431-32).

47.     Plaintiff also claims that Mr. Nervik asked her to spank him on more than one occasion and one time he gave her a spatula with which to spank him.  (Pl. Dep. at 191-92).  However, she admits that Mr. Nervik may have been joking when he made this statement.  (Pl. Dep. at 192).  Plaintiff never filed a grievance or notified Vassar's Human Resources Department about this.  (Pl. Dep. at 192-93).

48.     In her deposition, Plaintiff acknowledged that Mr. Nervik never made any romantic advances toward her, propositioned her or made any sexual advances

towards her.  (Pl. Dep. at 162).  Plaintiff further acknowledged that as of May 2004, Mr. Nervik had not subjected her to sexual touching.  (Pl. Dep. at 42).

49.      According to Plaintiff, she complained about Mr. Nervik in 2003 to Ms. Dalton, Mr. Harms and Ms. King, but she never made any written complaints.  (Pl. Dep. at 493-96).

50.      After complaining about Mr. Nervik to the ARAMARK managers, Plaintiff acknowledges that Mr. Nervik's alleged harassment would cease for a period of time.  (Pl. Dep. at 492-93).

## VIII.  ARAMARK ACCOMMODATES PLAINTIFF'S DIABETES BY ALLOWING HER TO EAT IN THE KITCHEN WHENEVER THE NEED AROSE

51.      Plaintiff has been diabetic for approximately 11 or 12 years.  (Pl. Dep. at 80, 105).

52.      Plaintiff controls her diabetes by taking the medications Glucovance and Avandia.  (Pl. Dep. at 107-08, 226-27).  With the assistance of these medications, Plaintiff has been able to sleep, stand up, walk, care for herself, think, concentrate on things and interact with others.  (Pl. Dep. at 107-08).  Plaintiff does not feel that her diabetes has affected her ability to do her job at Vassar.  (Pl. Dep. at 108).

53.      Prior to 2004, Plaintiff generally managed to control her blood sugar with only occasional problems.  (Pl. Dep. at 109-10, 112-13).

54.      In the Spring of 2004, Plaintiff's issues with low blood sugar increased.  (Pl. Dep. at 109-10).  Her physician advised her that she was taking too much medicine and was not properly spacing her meals.  (Pl. Dep. at 109-10).  As a result, when Plaintiff went home at the end of the day, she suffered from hypoglycemia due to low blood sugar.  (Pl. Dep. at 109).

55.     When Plaintiff advised Ms. King of her low blood sugar problems due to her diabetes, Ms. King allowed her to eat in the kitchen whenever the need arose. (Pl. Dep. at 115-16; King Dep. at 68-69, 74).  Ms. King did so even though Plaintiff did not provide a doctor's note. (King Aff. ¶13).

## IX.     IN MAY OF 2004, PLAINTIFF ALLEGEDLY COMPLAINS ABOUT VASSAR CO-WORKER DON NERVIK TO ARAMARK MANAGER BRUCE HARMS

56.     Plaintiff claims that in May of 2004, Mr. Nervik started "[t]rying to massage [her] shoulders," but she would tell him to stop and walk away.  (Pl. Dep. at 43, 161).

57.     Plaintiff approached Mr. Harms in May of 2004 and told him that she was very uncomfortable with Mr. Nervik putting his hands on her shoulders.  (Pl. Dep. at 190, 191).  She also told Mr. Harms about Mr. Nervik's alleged verbal harassment, shaking incidents and removal of her recipes that she had experienced in 2003.  (Pl. Dep. at 167-68, 184, 190, 191).

58.     Plaintiff told Mr. Harms that she could no longer deal with Mr. Nervik's conduct and requested a meeting to address it.  (Pl. Dep. at 168, 184, 250, 252, 253, 465).  According to Plaintiff, Mr. Harms replied, "Arlene, we're getting toward the end of the year.  It's a little busy.  But I'll get that meeting together."  (Pl. Dep. at 252).

59.     Plaintiff acknowledges that May is a very busy time for dining services at Vassar because of the catering requirements for graduation and alumni weekend.  (Pl. Dep. at 194).  At this time, there also were numerous meetings with the Union.  (Pl. Dep. at 194-95).

60.     While the meeting did not ultimately occur in May of 2004, Plaintiff has no reason to believe that Mr. Harms intentionally did not schedule the

meeting.  (Pl. Dep. at 195-96, 200).  Plaintiff further acknowledges that it was possible that the meeting was not arranged due to scheduling, given that there were only two weeks left in May and then she was leaving the ACDC kitchen for the summer.  (Pl. Dep. at 195-96, 200).

61.     To the extent that Plaintiff asked Mr. Harms to schedule a meeting to address Mr. Nervik's conduct in May 2004, Ms. King and Ms. Bettencourt were not aware of such request.  (King Dep. at 82-83; King Aff. ¶9; Affidavit of Theresa Bettencourt dated February 22, 2007 ("Bettencourt Aff." ¶4) (Ex. V)).  Plaintiff does not have any knowledge otherwise.  (Pl. Dep. at 254).

## X.     IN THE SUMMER OF 2004, ARAMARK REVISES THE MENUS FOR A NUMBER OF FOOD STATIONS IN ORDER TO ACCOMMODATE STUDENT PREFERENCES, INCLUDING THE FARM TO HOME STATION TO WHICH PLAINTIFF WAS ASSIGNED

62.     In the summer of 2004, Mr. Harms was temporarily assigned to work at the ARAMARK facility at the summer Olympics in Greece.  (Pl. Dep. at 253; Harms Dep. at 61).

63.     In Mr. Harms' absence, Ms. King and Ms. Bettencourt worked together to modify the menus for a number of food stations.  Changes were necessary because of student complaints about the food.  (Bettencourt Dep. at 40, 41).  In addition, it is important to maintain variety and introduce new food items each semester in order to accommodate student preferences.  (King Dep. at 54, 56).

64.     Plaintiff was assigned to the Farm to Home station, which specialized in vegetarian and vegan foods.  (Pl. Dep. at 151, 315).  The menus for this station were modified because the students had asked for more variety.  (King Dep. at 95).

65.    Ms. Bettencourt submitted her recommended menu modifications to Ms. King.  Ms. King reviewed and approved these modifications.  (King Aff. ¶10).

66.    ARAMARK has a bank of recipes and menus that are presented to food service workers in a special Eight Step format.  (Harms Dep. at 68; King Dep. at 95).  However, the selection of vegetarian and vegan recipes was not sufficient to meet the needs of Vassar's significant vegetarian and vegan student population.  (King Dep. at 95).  As a result, Ms. King and Ms. Bettencourt used recipes from vegetarian and vegan cookbooks with the intent that Mr. Harms would reformat the recipes into the Eight Step format when he returned from the Olympics.  (King Dep. at 95; Harms Dep. at 109-10).

67.    Plaintiff admits that the menus changed each semester, including the addition of new items in order to accommodate student tastes.  (Pl. Dep. at 202-03, 204).  Plaintiff is not aware of what other changes might have occurred in stations other than her own.  (Pl. Dep. at 208-09).

68.    In fact, significant changes were made to the other food stations. (Harms Dep. at 121).  For example, Brad Goulden, assigned to the pastry station, now was required to make his items from scratch as opposed to using box mixes.  (Harms Dep. at 121).  In addition, adjustments were made at other stations, including the introduction of over thirty new entrées at the Home Zone station and twenty new soups at the Soup station.  (Ex. D; King Aff. ¶11-12).

## XI.    UPON RETURNING TO WORK IN THE FALL OF 2004, PLAINTIFF COMPLAINS THAT HER WORKLOAD IS TOO MUCH TO HANDLE

69.    When Plaintiff returned to the ACDC kitchen in August of 2004, she learned that there had been some updates to the menus.  (Pl. Dep. at 204, 210, 262).

When she checked the assignment sheet, she found that a second entrée was added to the Farm to Home station.  (Pl. Dep. at 202, 204-05, 263).

70.    Plaintiff felt that this second entrée tripled her workload and that she did not have enough time to complete it.  (Pl. Dep. at 201-02, 210).  She says that she sometimes worked without a break in order to complete her work.  (Pl. Dep. at 135, 213, 214, 261).  Plaintiff believed that her duties were too much for her to handle and that her duties needed to be diminished in some way.  (Pl. Dep. at 315-16, 326-27, 328).

71.    No one from ARAMARK told Plaintiff to work through her break.  (Pl. Dep. at 125).  Indeed, employee breaks are mandatory.  Employees are not allowed to work through them without receiving authorization from a manager.  (King Dep. at 69).

72.    Plaintiff believed that Ms. Bettencourt added an extra entrée to the Farm to Home station in retaliation for Plaintiff's May 2004 complaint about Mr. Nervik because Ms. Bettencourt and Mr. Nervik were friends.  (Pl. Dep. at 201-02, 203, 247-49, 260-61, 328).  Plaintiff believed that Ms. Bettencourt was setting her up to fail, such that she would be unable to finish all of her work and then would be disciplined.  (Pl. Dep. at 260-61).

73.    Plaintiff also believed that Ms. Bettencourt increased her workload because of her heart condition based on Plaintiff's belief that Ms. Bettencourt did the same thing in 2000 because of her heart condition.  (Pl. Dep. at 207, 220-21).

74.    Although Plaintiff speculated that solely Ms. Bettencourt made the decision to effect menu changes, she does not know who made these decisions.  (Pl. Dep. at 263-65).  Plaintiff also does not know whether Mr. Harms told Ms. Bettencourt or anyone else about her May 2004 complaint.  (Pl. Dep. at 249, 254, 262).  Rather, she

speculates that Mr. Harms brought it up during a weekly meeting of ARAMARK managers.  (Pl. Dep. at 249-50, 254, 261-62).

75.     In August of 2004, Plaintiff complained about her workload to Ms. Dalton.  (Pl. Dep. at 210, 225, 246-47).  She told Ms. Dalton that she believed Ms. Bettencourt was harassing her by increasing her menu items, failing to provide complete recipes and setting her up for unwarranted discipline.  (Pl. Dep. at 218, 219-20, 222, 247).  Ms. Dalton told her that she would talk to Ms. King.  (Pl. Dep. at 222, 247).

**XII.    PLAINTIFF COMPLAINS THAT SHE SHOULD BE PAID "OUT OF CLASS" BASED ON HER BELIEF THAT HER PREDECESSOR, DANIEL BURNS, HAD RECEIVED SUCH PAY**

76.     In approximately August of 2004, Daniel Burns, a former Cook and Plaintiff's predecessor, told Plaintiff that he had received "out-of-class" pay, i.e., pay at the rate of an Assistant Chef, when he had been a Cook.  (Pl. Dep. at 88-89, 214, 322).  Plaintiff admits that she has never seen Mr. Burns' time cards.  (Pl. Dep. at 89).

77.     Even though Plaintiff held the position of Cook, based on her conversation with Mr. Burns, Plaintiff believed that she should be paid at the rate of an Assistant Chef, not a Cook.  (Pl. Dep. at 85, 87, 88-89).  Plaintiff conveyed this belief to Ms. Dalton, who told her that she would talk to Ms. King.  (Pl. Dep. at 91, 222, 247, 277-78, 321; King Dep. at 49).  Plaintiff also complained to Mr. Harms that Mr. Burns had received out-of-class pay and that she actually did more work than the Assistant Chefs.  (Pl. Dep. at 92-93).

78.     The Code of Conduct, which has been in place since the Fall of 1999, states:

> Your time card is to accurately reflect times worked on a daily basis.  Your time should be recorded at the beginning and at the end of each day.  You will not be paid for time

> worked outside of your schedule or classification unless
> your time card has been initialed by the manager on duty.

(Ex. E; King Dep. at 32, 47-48, 131-32).  The Code of Conduct was distributed to all

employees in the Fall of 1999.  (King Dep. at 132).  It was also posted on a bulletin board

outside of Mr. Harm's office.  (King Dep. at 132).

79.     After Ms. King learned of Plaintiff's complaint, she called the

payroll department to ascertain whether Plaintiff had followed the Code of Conduct

procedure for requesting out-of-class pay.  (King Dep. at 49-50, 89).  She learned that

Plaintiff had not done so.  (King Dep. at 49-50, 89).

80.     When Mr. Burns' time cards were located, they reflected that Mr.

Burns requested to be paid out-of-class on each occasion that he believed he was doing

Assistant Chef work, and that each request was authorized by a manager.  (King Dep. at

47, 48; see also Pl. Dep. at 89, 248, 322; Ex. F; King Aff. ¶12).

81.     Plaintiff's time cards showed that when she worked as a Cook but

covered for an Assistant Chef, she followed the correct procedure for requesting out-of-

class pay by noting it on her time card and obtaining managerial approval.  (Pl. Dep. at

90; King Dep. at 51, 53, 79-81; Ex. G; Ex. H).

82.     As a result of her investigation, Ms. King denied Plaintiff's request

to be paid at an Assistant Chef's pay rate.  (Pl. Dep. at 92, 278).

83.     Plaintiff did not grieve this issue in 2004 because "there were a lot

of things going on" and she counted on the Union to straighten out the issue.  (Pl. Dep. at

87, 91-92, 95-96).

**XIII.    PLAINTIFF COMPLAINS TO BRUCE HARMS UPON HIS RETURN FROM THE GREECE OLYMPICS**

84.    When Mr. Harms returned from the Olympics on Monday, September 6, 2004, Plaintiff approached him about her concerns that the menu changes to her station.  (Pl. Dep. at 210-11, 222-23, 225; Harms Dep. at 60-61, 62, 72; King Dep. at 101).  She also complained that Ms. Bettencourt was harassing her and setting her up for unwarranted discipline.  (Pl. Dep. at 218, 220, 222-23).  Specifically, she told Mr. Harms that Ms. Bettencourt had increased Plaintiff's workload such that Plaintiff was doing more work than the chefs.  (Pl. Dep. at 92, 211).  Mr. Harms told Plaintiff that he would look into the matter.  (Pl. Dep. at 92-93, 223).

85.    Plaintiff also provided Mr. Harms with a doctor's note dated September 2, 2004, stating that she needed to take a dinner break at 6:00 p.m.  (Pl. Dep. at 110-11, 116-17; Ex. I).  Even though employees typically were not scheduled to take breaks at 6:00 p.m. because it was the busiest time of day, ARAMARK allowed Plaintiff to eat at 6:00 p.m. or whenever she needed to eat.  (Pl. Dep. at 112, 113-16; King Dep. at 70).

86.    At approximately this point in time, Plaintiff claims that Mr. Nervik put his arms around her shoulders.  When she asked him to take his hands off of her, he allegedly shook her until she shouted, "Get your hands off of me."  (Pl. Dep. at 280-81, 282-83, 291-94).

87.    Plaintiff told several of her Vassar co-workers and the Union about this incident, but she did not report it to Vassar's Human Resources Department or an ARAMARK manager.  (Pl. Dep. at 294-95).

## XV.    MS. KING LEARNS ABOUT FRICTION BETWEEN PLAINTIFF AND MR. NERVIK OVER THEIR RESPECTIVE JOB DUTIES.

88.    Ms. King learned from Mr. Harms and others that there was friction between Plaintiff and Mr. Nervik regarding their respective job duties.  (King Dep. at 83-84).  Specifically, Plaintiff believed that Mr. Nervik wanted to be in control of her in the kitchen and freely change her job assignments.  (Pl. Dep. at 338, 355).  As an Assistant Chef, Mr. Nervik did not have supervisory responsibilities, but he was responsible for making sure that the food was prepped, executed and served.  (Nervik Dep. at 29-30, 35).  He occasionally told Plaintiff that it was his responsibility as Assistant Chef to make sure that they got the food out.  (Nervik Dep. at 31).

89.    Sometime between September 5, 2004 and September 8, 2004, Mr. Nervik spoke to Ms. King and requested a meeting with Plaintiff.   Mr. Nervik wanted to clarify Plaintiff's job duties and the level of responsibility expected of her because it seemed to him that Plaintiff was unhappy with her workload.  (Nervik Dep. at 52-53, 54-55, 63).

## XIV.    PLAINTIFF MEETS WITH THE NEW YORK HUMAN RIGHTS DIVISION WITH THE INTENTION OF FILING A COMPLAINT

90.    At the beginning of September, 2004, Plaintiff's daughter, Cassandra, contacted the New York Division of Human Rights because Plaintiff seemed upset when she came home from work.  (Pl. Dep. at 296, 298, 310-11, 486).

91.    Then, on September 8, 2004, prior to going to work, Plaintiff went to the Division's Duchess County office to submit her intake form regarding her complaints.  Prior to September 8, 2004, Plaintiff did not tell anyone that she had gone to the New York Division.  (Pl. Dep. at 300, 485-86; Ex. J).

**XVI.   PLAINTIFF COMPLAINS ABOUT ALLEGED SEXUAL
HARASSMENT, DISCRIMINATION AND RETALIATION AT THE
SEPTEMBER 8, 2004 MEETING**

92.     On or about September 8, 2004, a meeting was held in the Dodge

Room at ACDC, which is a small function room that can be closed off for privacy.  (Pl.

Dep. at 306, 508; King Dep. at 93; Harms Dep. at 75, 79).

93.     The meeting was attended by Plaintiff, Ms. King, Mr. Nervik, Ms.

Bettencourt, Mr. Harms, Steve Greenberg, a Union Steward, Robert Hanaburgh, the head

of the Union, Cassandra Krikelis, Plaintiff's daughter, and an ARAMARK intern.  (Pl.

Dep. at 310, 311, 313).

94.      At the beginning of the meeting, Plaintiff's daughter attempted to

tape record the meeting, but was not allowed.  (Pl. Dep. at 311, 313-14).

95.     Plaintiff raised her concern that she felt that her duties with respect

to the Farm to Home station had been increased.  (Pl. Dep. at 326-27).  She believed that

it was too much work for one person to handle and that she was not working within her

job description, but rather was working in a Chef's job description.  (Pl. Dep. at 327).

96.     Mr. Nervik also spoke about how he wanted the kitchen to run and

Plaintiff's job assignments.  (Pl. Dep. at 315-17, 325; King Dep. at 105; Harms Dep. at

80; Nervik Dep. at 64).

97.     Then, at some point in the meeting, Plaintiff pointed her finger at

Mr. Nervik and said, "I'm charging you with sexual harassment" and then turned to Ms.

King and said, "I'm charging you with discrimination."  (Pl. Dep. at 324, 330; King Dep.

at 95; Nervik Dep. at 65).

98.     Specifically, Plaintiff accused Mr. Nervik of verbal and physical

harassment, removing her recipes, hiding her carts, changing her menus, turning up her

ovens, and hugging her.  (Pl. Dep. at 331-32).  In describing the alleged verbal abuse at the meeting, Plaintiff explained that Mr. Nervik made statements like, "Hey, woman", "Get over here", "You will do what I say," and "I'm the chef."  (Pl. Dep. at 338). Plaintiff described the physical abuse as the shaking incident and one time when Mr. Nervik hugged her.  (Pl. Dep. at 338-39).

        99.    Plaintiff accused Ms. King of discriminating against her because of the alleged difference in pay compared to her predecessor, Daniel Burns.  (Pl. Dep. at 91, 94, 321, 330).   Plaintiff told her, "When you allow me to be paid for the same work that I'm doing with my male co-worker, and you pay me less money, you are discriminating against me."  (Pl. Dep. at 330).  Ms. King responded that she looked into the issue and she knew that Mr. Burns had received Assistant Chef's pay at least a couple times a week.  (Pl. Dep. at 321).

        100.    Plaintiff recalls that Ms. King stated, "I will not entertain your allegation," which she believed meant that Ms. King would not investigate her allegations.  (Pl. Dep. at 343-45).

        101.    Ms. King testified, "I was flabbergasted" because she thought they were going to talk about menus.  She recalls stating something to the effect of, "This is not the forum to be discussing a sexual harassment charge between two employees." (King Dep. at 92, 94-96).

        102.    Plaintiff also accused Ms. Bettencourt of retaliating against her and threatening her with unwarranted disciplinary action.  (Pl. Dep. at 210, 211, 218, 220, 225-26, 255, 256-57, 315, 328).  At the meeting, Plaintiff supported her allegation by

explaining that she thought that Ms. Bettencourt had increased her workload so that she could not complete it.  (Pl. Dep. at 315, 328).

103.    Because Ms. King felt that the meeting was spiraling out of control and Plaintiff and her daughter were becoming extremely emotional, she ended the meeting.  (Pl. Dep. at 329; King Aff. ¶14).

## XVII.    ARAMARK INVESTIGATES PLAINTIFF'S ALLEGATIONS

104.    According to Ms. King, the September 8, 2004 meeting was the first time that she learned of Plaintiff's discrimination, sexual harassment and retaliation claims.  (King Aff. ¶14).  Plaintiff does not specifically recall complaining to Ms. King prior to September of 2004.  (Pl. Dep. at 225-26, 255, 256-57).

105.    Plaintiff does not know the extent to which Ms. King investigated her complaints.  (Pl. Dep. at 339, 370-71).  She never followed up with anyone at ARAMARK regarding the investigation into her complaints.  (Pl. Dep. at 407).

106.    Immediately following the September 8, 2004 meeting, Ms. King immediately spoke to Mr. Nervik after everyone else had left the Dodge Room.  (King Dep. at 96, 100).  She asked him if he had sexually harassed or touched Plaintiff inappropriately.  (King Dep. at 96).  He denied it.  (King Dep. at 96).  Ms. King asked him if he had touched Plaintiff at all.  (King Dep. at 96).  He said that he had put his arms on her shoulders to console her because he felt that Plaintiff was under a lot of stress at that time.  (King Dep. at 96).

107.    Ms. King instructed Mr. Nervik to stay away from Plaintiff.  (King Dep. at 97).  She told him that she would be contacting Kim Collier, the Associate Director of Human Resources at Vassar.  (King Dep. at 97).

108.    When Ms. King left the Dodge Room, she ran into Plaintiff and her daughter who were standing right outside.  (King Dep. at 97; Pl. Dep. at 340).  Plaintiff was crying and Ms. King told her that she should try to calm down and eat something.  (Pl. Dep. at 340-41; King Dep. at 97).  Ms. King told Plaintiff that she spoke to Mr. Nervik and told him that he should stay away from Plaintiff.  (King Dep. at 97, 100).  Ms. King also told Plaintiff that she would be contacting Ms. Collier and that she thought Ms. Collier would be in touch with Plaintiff.  (King Dep. at 97).

109.    Ms. King also spoke to each individual ARAMARK manager, including Mr. Harms, to determine whether any had knowledge of Plaintiff's discrimination, harassment and retaliation claims.  No one had.  (King Dep. at 97-99, 100; Harms Dep. at 84-85).

110.    Next, Ms. King called Kimberly Collier, the Associate Director of Human Resources at Vassar, and reported what had happened.  (King Dep. at 85, 97; Deposition of Kim Collier taken on December 14, 2006 ("Collier Dep.") at 5, 12-13).  Ms. King advised Ms. Collier of her belief that Plaintiff's complaint should be referred to Belinda Guthrie, Vassar's Affirmative Action Officer, for investigation.  (Collier Dep. at 14).  Ms. Collier told Ms. King that she wanted to speak to Plaintiff and Mr. Nervik to remind them of the process for handling complaints of harassment and discrimination.  (Collier Dep. at 15).

111.    Ms. King also communicated to the employees at both the Retreat and ACDC through a memo posted on bulletin boards in both locations that there was to be no touching in the kitchen or workplace, not even friendly touching or hugging.  This rule was reinforced in an employee meeting in January of 2005.  (King Dep. at 98).

## XVIII.   <u>VASSAR INVESTIGATES PLAINTIFF'S ALLEGATIONS AND PLAINTIFF REFUSES TO PARTICIPATE</u>

112.    After speaking with Ms. King on September 8, 2004, Ms. Collier immediately began her investigation by speaking to Mr. Nervik.  (Collier Dep. at 15-16, 18).  She met with Mr. Nervik and Mr. Hanaburgh in the Dodge Room in ACDC.  (Collier Dep. at 16).  They discussed Plaintiff's allegations that he sexually harassed her because he hugged her when she did not want to be hugged.  (Collier Dep. at 16-17).

113.    Ms. Collier testified that Mr. Nervik said "he was upset because he said that his intention was to try to help Arlene with her job duties."  (Collier Dep. at 17).  Ms. Collier told Mr. Nervik that she planned to speak to Plaintiff.  (Collier Dep. at 17).  She also explained the process for filing complaints of harassment with the Office of Affirmative Action.  (Collier Dep. at 17).

114.    After meeting with Mr. Nervik, Ms. Collier asked Mr. Hanaburgh to bring Plaintiff to the Dodge Room to meet with them.  (Collier Dep. at 18, 20).  Mr. Hanaburgh returned about ten minutes later and said that Plaintiff would not meet with her.  (Collier Dep. at 18).

115.    Ms. Collier asked Mr. Hanaburgh to tell Plaintiff to go to the Office of Affirmative Action if she had a harassment complaint and that Plaintiff could also speak to Ms. Collier to facilitate her meeting with the Office of Affirmative Action.  (Collier Dep. at 18).

116.    After Ms. Collier returned to her office on September 8, 2004, she relayed to Sarah Hoger, then the Director of Human Resources, the substance of her conversations with Ms. King and Mr. Nervik.  (Collier Dep. at 19; Deposition of Sarah Hoger taken on December 14, 2006 ("Hoger Dep.") at 6-7, 15-16, 18-19, 25).  Ms.

Collier also told Ms. Hoger that she attempted to meet with Plaintiff, but that Plaintiff had refused.  (Collier Dep. at 19; Hoger Dep. at 18-19).

### XIX.   ON SEPTEMBER 12, 2004, PLAINTIFF COLLAPSES AT WORK WHEN MR. NERVIK INSISTS ON MAKING EGGPLANT SANDWICHES

117.    On or about September 9, 2004, the day after the meeting, Plaintiff told Mr. Harms that she was concerned about the assignments for the upcoming Sunday, September 12, 2004.  (Pl. Dep. at 352-53, 354; Harms Dep. at 87, 90).  Because Sundays were generally slow, fewer managers were assigned to work.  (Harms Dep. at 19).  Accordingly, in 2004, only Ms. Reeves and Ms. Bettencourt supervised the employees on Sundays.  (Reeves Dep. at 11).

118.    Ms. Bettencourt worked the Sunday morning shift from 6:00 a.m. to 2:00 p.m.  (Bettencourt Dep. at 14).  Ms. Reeves worked the Sunday evening shift from 12:30 p.m. to 9:30 p.m., which was the same shift that Plaintiff and Mr. Nervik worked on Sundays.  (Reeves Dep. at 11; Pl. Dep. at 147; Nervik Dep. at 89, 97).

119.    Plaintiff asked Mr. Harms to "protect" her based on her fear that Mr. Nervik would take recipes away from her and try to control her job duties during the shift.  (Pl. Dep. at 353, 355).  Plaintiff was concerned because Ms. Bettencourt was the only manager on Sundays and Plaintiff believed that most of the abuse happened to her on Sundays.  (Pl. Dep. at 353).

120.    In an effort to "try to keep the conflict to a minimum," Mr. Harms prepared a memorandum to clarify Plaintiff and Mr. Nervik's respective roles, even though he did not typically give out work assignments in this format.  (Pl. Dep. at 353-54; King Dep. at 106; Harms Dep. at 89; Ex. K).  The memorandum essentially provided

that Plaintiff would prepare the eggplant sandwiches and Mr. Nervik would prepare the fettucini.  (Ex. K).

121.    The memorandum was distributed to Plaintiff, Mr. Nervik, and ARAMARK managers.  (Harms Dep. at 92-93; Pl. Dep. at 353; King Dep. at 105-06).

122.    On Sunday, September 12, 2004, Plaintiff started preparing the eggplant sandwiches.  (Pl. Dep. at 352, 361).  When she returned from lunch, she noticed Mr. Nervik and Ms. Bettencourt standing together and talking at the back of the kitchen. (Pl. Dep. at 354, 355-56, 360).  Plaintiff admits that she did not know what they were discussing.  (Pl. Dep. at 360-61).

123.    Before she got to the table, Plaintiff observed Ms. Bettencourt laugh and walk away.  (Pl. Dep. at 356, 360).  Plaintiff then noticed that Mr. Nervik was using the ingredients for the eggplant sandwich to prepare the sandwiches himself.  (Pl. Dep. at 356, 361-62, 504).  Plaintiff did not ask anyone nor did anyone tell her why the eggplant sandwich ingredients were on Mr. Nervik's table.  (Pl. Dep. at 362).

124.    Plaintiff did not want to switch recipes.  (Pl. Dep. at 364-65).  She became upset because she thought Ms. Bettencourt and Mr. Nervik were plotting against her.  (Pl. Dep. at 502-03).  Plaintiff believed that they wanted to remove her from her job because of her "complaint of Ms. Betancourt's retaliation, her increasing [her] recipes, giving [her] incomplete recipes, threatening [her], having [her] disciplined over and over again, threatening to remove [her] from [her] job, Don Nervik's harassment [she] was being exposed to, the verbal, the physical, the emotional."  (Pl. Dep. at 285).

125.    Plaintiff became extremely upset and called Mr. Hanaburgh, the Union's Chief Shop Steward.  (Pl. Dep. at 307, 356).  When Mr. Hanaburgh arrived,

Plaintiff showed him the memorandum from Mr. Harms.  (Pl. Dep. at 356).  Plaintiff believed that Mr. Nervik and Ms. Bettencourt were watching her while she showed Mr. Hanaburgh the memo.  (Pl. Dep. at 358).  Mr. Hanaburgh said that he would talk to Mr. Nervik.  (Pl. Dep. at 357).

126.    Plaintiff then spoke by phone to Mr. Harms, who was at home on his day off.  (Pl. Dep. at 357).  Mr. Harms told her that Mr. Nervik had a higher classification than she did and that Mr. Harms' only concern was getting the meal out. He told Plaintiff to let Mr. Nervik make the eggplant sandwiches.  (Pl. Dep. at 366-67).

127.    While she was talking to Mr. Harms, Plaintiff began to feel sick so she threw the phone down and ran into the ladies room where she became ill and passed out on the floor.  (Pl. Dep. at 358).  A coworker found Plaintiff in the bathroom and called 911.  (Pl. Dep. at 358).  Plaintiff said that she was experiencing chest pains and told the paramedics that she thought she was dying.  (Pl. Dep. at 359).

128.    Plaintiff was also concerned about calling her husband, Heinz. (King Dep. at 113).  Heinz was very sick, having suffered from pulmonary fibrosis from several years, and Plaintiff was worried about upsetting him.  (Pl. Dep. at 15, 16-17).

129.    Plaintiff was out of work for two weeks.  (Pl. Dep. at 309).

## XX.    PLAINTIFF STILL REFUSES TO COOPERATE WITH VASSAR'S INVESTIGATION

130.    On or about September 22, 2004, Plaintiff sent a registered letter to Ms. Hoger requesting an investigation of her harassment allegations.  (Ex. L; Pl. Dep. at 368-69, 370, 371, 375; Hoger Dep. at 20).

131.    The letter did not contain any specific information about the basis for her discrimination and harassment claims.  (Pl. Dep. at 390, 466-68; Ex. L).  Plaintiff

did not prepare a written description of the incidents "because [she] expected that the union and [herself] would go into a meeting with Ms. Hoger and she could do an investigation from there."  (Pl. Dep. at 400).

132.    As Vassar's Affirmative Action Officer, Ms. Guthrie was responsible for investigating Vassar's non-faculty harassment and discrimination complaints.  (Collier Dep. at 15; Hoger Dep. at 8, 17, 21, 23-24).

133.    More specifically, Vassar's anti-discrimination policy provides:

> Any member of the community who approaches any office
> or individual with a concern about treatment by or
> involving a student or member of the staff or administration
> (and not involving faculty), which seems to violate the
> college's nondiscrimination and nonharassment policy
> should be referred to the equal opportunity/affirmative
> action officer (EO/AA) for discussion of the issues.  In all
> cases the equal opportunity/affirmative action officer
> provides counsel and assists him or her in determining
> whether the complaint is appropriate for grievance, and
> provides counsel on the College's nondiscrimination and
> nonharassment policy and informal and formal grievance
> procedures.  Discussing a complaint with the equal
> opportunity/affirmative action officer does not commit one
> to making a formal charge.

(Ex. M).

134.    The policy further states that "Vassar College will endeavor to maintain confidentiality in all informal and formal proceedings, except as otherwise specified in these statements of procedure."  (Ex. M).

135.    On or about September 23, 2004, Ms. Guthrie sent Plaintiff a letter requesting additional information about Plaintiff's allegations.  (Ex. A; Pl. Dep. at 381, 387-90, 469).

136.    Specifically, Ms. Guthrie's letter stated:

> Your complaint did not include a description of the alleged incidents of discrimination and harassment. If you wish to file a complaint, you will need to provide specific information about incidents which you perceive to be discriminatory and harassing, and the involvement of each party named in your complaint. To file a complaint please schedule an appointment with me or file a written complaint with the EO/AA office within 60 days of the last date of the alleged incidents of discrimination or harassment.

(Pl. Dep. at 389-90; Ex. A).

137.     Plaintiff decided not to respond to Ms. Guthrie's letter because "[she] had already gone to the State Division of Human Rights, and [she] felt that it was in their hands, and they would conduct the investigation at that point." (Pl. Dep. at 390, 399, 469, 471, 473, 475, 487).

138.     On or about September 24, 2004, Ms. Hoger called Plaintiff and advised her to speak with Ms. Guthrie to provide additional information about the nature of her complaints. She explained that it was Ms. Guthrie's responsibility to investigate discrimination and harassment complaints. (Pl. Dep. at 377, 379, 381-82; Hoger Dep. at 20, 36).

139.     Plaintiff refused to contact or provide information to Ms. Guthrie because she believed that Ms. Guthrie might not maintain confidentiality. (Pl. Dep. at 382, 386, 399-400). Additionally, Plaintiff had already visited the Human Rights office so Plaintiff felt that she did not need to speak to Ms. Guthrie. (Pl. Dep. at 385-86, 399).

140.     Plaintiff did not have any further communications with Ms. Hoger. (Pl. Dep. at 379). She never contacted Belinda Guthrie. (Pl. Dep. at 382, 399-400, 468-69, 470-71).

## XXI.    IN NOVEMBER OF 2004, PLAINTIFF OPTS NOT TO TAKE A BREAK

141.    Plaintiff acknowledges that after the September 8, 2004 meeting, ARAMARK addressed her workload concerns by adjusting the menus at the Farm to Home station and making them easier to complete.  (Pl. Dep. at 218, 351).

142.    However, sometimes Plaintiff still felt overwhelmed by her workload.  On November 10, 2004, the kitchen staff, including Plaintiff, had to attend a mandatory meeting.  (Pl. Dep. at 120; Ex. J).  When the meeting finished, Plaintiff and Joe Szymkiewicz, one of the Chefs, decided to work through their break because they were behind in their work and they believed that they could not finish the meal on time if they did not work though their break.  (Pl. Dep. at 120-22, 125).  Plaintiff admits that it was her decision to forgo her break and no one from ARAMARK told her that she needed to work through her break on that day.  (Pl. Dep. at 125).

143.    Because Plaintiff felt that she was unable to take her break and get all of her work done, she gave another copy of her September 2, 2004 doctor's note to Mr. Harms and Ms. King in November.  (Pl. Dep. at 114, 125; Ex. J).

144.    Plaintiff alleges, however, that after she gave provided a second copy of the doctor's note, Mr. Harms and Ms. King promised to let her take the breaks but they did not let her take them at 6:00 p.m. until August, 2006.  (Pl. Dep. at 114-15).

145.    Plaintiff admits that no one from ARAMARK told her that she needed to work through her break, but rather it was her own decision.  (Pl. Dep. at 125).

146.    Plaintiff was extremely emotional during this time because she realized that her husband was going to die.  He passed away on November 26, 2004.  Understandably, Plaintiff continued to suffer emotional difficulties for at least a year after his passing.  (Pl. Dep. at 15, 16-17, 19, 22).

## XXII.    THE ALLEGED DISCRIMINATION AND HARASSMENT STOPS AS OF AUGUST, 2005

147.    In approximately April of 2005, Mr. Nervik moved to the first shift while Plaintiff continued working on the second shift.  (Pl. Dep. at 430-31; Harms Dep. at 101; Nervik Dep. at 96-97)  In August of 2005, Terri Bettencourt transferred out of Vassar to a new ARAMARK location.  (Bettencourt Dep. at 13-14).

148.    Since these changes, Plaintiff believes that things have improved and she has not experienced any verbal or physical harassment.  (Pl. Dep. at 431-33).  However, Plaintiff still believes that her male co-workers sometimes hide her recipes and make jokes in the kitchen.  (Pl. Dep. at 433).

## XXIII.    IN OCTOBER OF 2005, PLAINTIFF IS PROMOTED AGAIN

149.    When Mr. Nervik moved to the first shift in April of 2005, Plaintiff could have bid into his old position as a second shift Assistant Chef.  However, Plaintiff did not do so.  (King Aff. ¶15).

150.    Plaintiff also declined to bid into the Assistant Chef position when it became open again in the Summer of 2005.  (Pl. Dep. at 256; Harms Dep. at 98-100; Nervik Dep. at 103-04; King Aff. ¶16).

151.    In approximately August of 2005, Plaintiff filed a grievance claiming that she should be paid a Cook's rate for doing an Assistant Chef's job.  (Pl. Dep. at 87, 91-92, 95, 97).

152.    In October of 2005, ARAMARK promoted her to Assistant Chef and paid her two to three weeks of back pay.  (Pl. Dep. at 96, 420; King Dep. at 51).

Dated:  February 23, 2007            Respectfully submitted,
        New York, New York


   /s/ Tamsin J. Newman
TAMSIN J. NEWMAN (TN-4219)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

Of Counsel:
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Attorney for Defendant
ARAMARK Campus Services, Inc.

/s/ Vincent P. D'Andrea
Vincent P. D'Andrea, Esq.  (6614)
Donoghue, Thomas, Auslander &
Drohan
2517 Route 52
Hopewell Junction, NY 12533
845-227-3000

Attorneys for Defendant Vassar College