UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARLENE M. KRIKELIS,

                    Plaintiff,

    -v-

VASSAR COLLEGE and
ARAMARK CAMPUS SERVICES,

                    Defendants.

Case No. 06-CV-4203 (KMK)

<u>OPINION AND ORDER</u>

---

<u>Appearances:</u>

Helen G. Ullrich, Esq.
Bergstein & Ullrich, LLP
Chester, New York
*Counsel for Plaintiff*

Vincent P. D'Andrea, Esq.
Donoghue, Thomas, Auslander, & Drohan
Scarsdale, New York
*Counsel for Defendant Vassar College*

William J. Delany, Esq.
Jill Barbarino, Esq.
Anne E. Martinez, Esq.
Morgan, Lewis & Bockius LLP
Philadelphia, Pennsylvania
*Counsel for Defendant Aramark Campus Services*

KENNETH M. KARAS, District Judge:

       Plaintiff Arlene Krikelis ("Plaintiff") brings this case complaining of "discrimination based on sex and disability and retaliation for resisting illegal discrimination" in connection with her employment by Defendant Vassar College ("Vassar") at a campus dining facility managed by Defendant Aramark Campus Services ("Aramark"). (Compl. ¶ 1.) The Complaint seeks

relief against Vassar pursuant to: (1) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (2) the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and (3) New York Human Rights Law § 296. The Complaint also seeks to hold Aramark liable under the NYHRL as an aider and abettor of Plaintiff's employer, Vassar. Defendants' joint motion seeks summary judgment on four issues: (1) Plaintiff's disability discrimination claims; (2) Plaintiff's gender discrimination claim based on her pay as a cook; (3) Plaintiff's gender-based harassment claim; and (4) Plaintiff's retaliation claim. For the reasons stated herein, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## I. Background

### A. Factual History

Plaintiff has been employed at Vassar's campus dining facilities since 1987. (Defs.' Rule 56.1 Statement of Material Undisputed Facts ("Defs.' 56.1") ¶ 1.) Throughout her employment, Plaintiff has worked principally at Vassar's main dining hall, the All Campus Dining Center ("ACDC"). (*Id.* ¶ 4.) She was initially hired as a Kitchen Worker, the most junior of five levels of ACDC food service workers, and was sequentially promoted to Cook, the third or intermediate of the five levels. (*Id.* ¶¶ 3-4.) Following her promotion, Plaintiff was the only woman at her level of seniority or higher (Plaintiff was the only female Cook; there were no female Assistant Chefs, the level of seniority between Cook and Head Chef; and the Head Chef was and had always been a male). (*Id.* ¶ 2.)[1]

Vassar contracts with Aramark to provide food services on campus, and Aramark's

---

[1] Subsequent to the events giving rise to this case, Plaintiff was promoted to Assistant Chef in October 2005, following her filing of a union grievance. (Defs.' 56.1 ¶¶ 151-52.)

managers supervise Vassar employees working in the ACDC. (*Id.* ¶ 4.) During the period of events giving rise to this case, Aramark's managers included Senior Director of Dining Maureen King ("King"), Associate Food Services Director Bruce Harms ("Harms"), and Assistant Director Terri Bettencourt ("Bettencourt"). (*Id.* ¶ 5.) In addition, Diane Dalton ("Dalton") served as Assistant Director prior to 2004, when she became Production Manager, and Anna Reeves ("Reeves") was the Employee Manager. (*Id.*) Donald Nervik ("Nervik") has been Plaintiff's coworker as a Vassar dining services employee since she started her job in 1987. (*Id.* ¶ 18).

### i. Plaintiff's Diabetes

Plaintiff has been diabetic for approximately eleven to twelve years. (Defs.' 56.1 ¶ 51.) By medication and a managed eating schedule, Plaintiff generally is able to control her blood sugar with only occasional problems. (*Id.* ¶¶ 52-53; Pl.'s Response in Opp. to Def.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 52-53.) In the spring of 2004, however, Plaintiff's issues with low blood sugar increased and her physician advised her that she was taking too much medicine and was not properly spacing her meals. (Defs.' 56.1 ¶ 54.)

On September 2, 2004, Plaintiff received a doctor's note on a prescription pad stating: "Arlene is being treated for diabetes[;] she has been advised to take dinner at 6PM." (Pl.'s Attorney Affirmation ("Pl.'s Atty. Aff."), Ex. 2.) According to Plaintiff, she gave a copy of this doctor's note to Harms sometime before September 7, 2004, and she again gave copies to Harms and to King in November 2004. (Pl.'s 56.1 ¶ 55.) Thereafter, King told Plaintiff that, when she needed food, she could go into a corner to eat something. (*Id.*)

At oral argument, Plaintiff's counsel clarified the relevant factual issue in Plaintiff having been allowed only a "quick bite" when she believed that she required a "full break" to eat a

"balanced meal." The Parties agree that in the fall of 2004, Plaintiff was given special permission to eat on the line when necessary; Plaintiff was not, however, given leave to take a "full break" at 6 p.m. by going into another room. The distinction, explained Plaintiff's counsel, was that a "full break" would entail having another employee cover Plaintiff's work station so that Plaintiff was not dependent on a break in student customer traffic to take her "quick bite" of food.

In August 2006, Aramark managers granted Plaintiff the 6 p.m. meal break she sought. (Pl.'s 56.1 ¶ 55.)

### ii. Plaintiff's Title and Compensation History

Plaintiff was promoted to Cook in October 2001 (Pl.'s Statement Pursuant to Local Rule 56.1 ¶ 1.) Since the fall of 1999, Defendants have had in place a "Code of Conduct" stating that employees were required to submit accurate time cards on a daily basis and that the employee "will not be paid for time worked outside of your schedule or classification unless your time card has been initialed by the manager on duty." (Defs.' 56.1 ¶ 78.)

In approximately August 2004, Plaintiff learned from her predecessor in the Cook position, Daniel Burns ("Burns"), that Burns had received "out-of-class" pay (that is, pay at the rate of Assistant Chef) when he had held the Cook position. (*Id.* ¶ 76.) On the basis of this conversation, Plaintiff believed that she should be entitled to the same higher compensation and raised the issue with Dalton, then the production manager, who told Plaintiff she would talk with King. (*Id.* ¶ 77.) Plaintiff also raised the issue with Harms. (*Id.*)

King investigated the issue. (*Id.* ¶¶ 79-83.) She determined that Burns had marked on his time cards for the relevant periods that he had performed out-of-class work and that each request for out-of-class pay had been authorized by a manager. (*Id.* ¶ 80.) She also determined

that Plaintiff's time cards showed that when Plaintiff worked as a Cook but covered for an Assistant Chef, she followed the same procedure for requesting out-of-class pay by noting it on her time card and obtaining managerial approval. (*Id.* ¶ 81.) Plaintiff accepts all this, but contends that none of the Aramark managers made her aware that she could obtain Assistant Chef pay for performance of some of her regular assigned job duties. (Pl.'s 56.1 ¶ 81.) Put differently, the material fact claimed by Plaintiff revolves around management instruction as to *when* she could request (and record on her time card) out-of-class pay, not around whether she was paid out-of-class on the occasions that she did request it and note it on her timecard.

### iii. Plaintiff's Relationship with Donald Nervik

Plaintiff has known Nervik, a fellow Vassar dining services employee, since she became a Vassar employee. (Defs.' 56.1 ¶ 18.) During the 1990s, they were collegial as coworkers. (*Id.* ¶ 20; Pl.'s 56.1 ¶ 37.) In the course of their friendship, Plaintiff allowed Nervik to put his arm around her shoulders and she sometimes allowed other male employees to hug her. (Defs.' 56.1 ¶ 21.)

Plaintiff alleges that her relationship with Nervik deteriorated in 2003 when he allegedly began to verbally and physically assault her. (*Id.* ¶ 36.) Plaintiff asserts that Nervik was going through a divorce at this time, and his conduct toward her and toward other women changed. (Pl.'s 56.1 ¶ 37.) Plaintiff acknowledges that the alleged harassment was not directed at her in a sexual manner, but maintains that it was on account of her gender. (Defs.' 56.1 ¶ 36, 48; Pl.'s 56.1. ¶ 48)

For example, Plaintiff has offered deposition testimony of Joseph Symkiewicz, an Assistant Chef at ACDC, stating that he observed Nervik intimidate Plaintiff, stand over her, and invade her space; yell at Plaintiff; and tell her: "You are the woman and I am the man and you

will do as I say."  (Pl.'s 56.1 ¶ 39; Pl.'s Atty. Aff., Ex. 5 ("Szymkiewicz Aff.") ¶ 10.)

With respect to physical harassment, Plaintiff alleges that Nervik put his arm around her "very few times" in 2003 and that, when he did, Plaintiff moved away from him and said she did not want to be hugged.  (Defs.' 56.1 ¶ 42.)  Plaintiff has also alleged that Nervik interfered with her work by removing her recipes, and that Nervik asked Plaintiff to spank him on more than one occasion (although she admits he may have been joking in these statements).  (*Id.* ¶¶ 46-47.)

### iv.  Reaction of Aramark and Management

According to Plaintiff, she repeatedly complained about Nervik's conduct in 2003 to Dalton, Harms, and King, but did not make written complaints at that time.  (Defs.' 56.1 ¶ 49.) When she complained, the Aramark managers told her that they would respond to it; afterward, the abuse would pause temporarily before resuming.  (*Id.* ¶ 50.)

Plaintiff has introduced evidence showing that Aramark managers had direct and substantial knowledge of Nervik's misconduct toward her.  For example, Szymkiewicz has stated in an affidavit that "Nervik's misconduct toward plaintiff was common knowledge in the kitchen and all the Aramark managers, including Maureen King, Bruce Harms and Diane Dalton, were aware of it."  (Szymkiewicz Aff. ¶ 7.)  Cathy Bradford, another ACDC employee, stated in an affidavit that "[e]veryone in the kitchen was aware of Nervik's mistreatment of plaintiff, including Aramark managers."  (Pl.'s Atty. Aff., Ex. 6 ¶ 19.)

In May 2004, Plaintiff approached Harms and told him that she was very uncomfortable with Nervik putting his hands on her shoulders.  (Defs.' 56.1 ¶ 57.)  She also told Harms about Nervik's harassment, shaking incidents, and the removal of her recipes that she had experienced in 2003.  (*Id.*)  Plaintiff told Harms that she could no longer deal with Nervik's conduct and requested a meeting to address it.  (*Id.* ¶ 58.)  Harms told Plaintiff that although it was a busy

time near the end of the academic year, he would arrange a meeting. (*Id.*) He did not, however, arrange such a meeting and no action was taken to stop Nervik's misconduct. (Defs.' 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) Defendants represent that King and Bettencourt had no knowledge of Plaintiff's May 2004 request to schedule a meeting. (Defs.' 56.1 ¶ 61.) Although Plaintiff purports to "[a]dmit only that Aramark managers now testify that they had no knowledge of [P]laintiff's complaints," she does not point to any evidence showing that anyone other than Harms actually had such knowledge. (Pl.'s 56.1 ¶¶ 61, 74.)

The next academic year (with its concomitant return to full staffing at the ACDC) began in August 2004. (Defs.' 56.1 ¶ 12.) At that time, Harms was temporarily assigned by Aramark to work at the Summer Olympics in Greece. King and Bettencourt together modified the menus for a number of food stations including the one managed by Plaintiff. (*Id.* ¶¶ 63-64.) Plaintiff acknowledges that menus were changed regularly in response to student-customer requests, but asserts that she was singled-out during the menu changes by being the only employee whose entire workload was significantly increased by an assignment to create an additional entree. (Pl.'s 56.1 ¶¶ 64-69.) Plaintiff felt that the additional entree tripled her workload and that she did not have enough time to complete it; therefore, she sometimes worked through her break to complete her work. (Defs.' 56.1 ¶ 70.) Defendants state that no one from Aramark told Plaintiff to work through her break. (*Id.* ¶ 71.)

In August 2004, Plaintiff complained about her workload to Dalton. (*Id.* ¶ 75.) Plaintiff told Dalton that she believed Bettencourt was harassing her by increasing her menu items, failing to provide complete recipes, and setting her up for unwarranted discipline. (*Id.*) Dalton told Plaintiff she would speak with King. (*Id.*) In addition, Plaintiff raised the same concerns with Harms when he returned from Greece on Monday, September 6, 2004. (*Id.* ¶ 84.)

Sometime between September 5, 2004, and September 8, 2004, Nervik spoke to King and requested a meeting with Plaintiff. (*Id.* ¶ 89.) Nervik gave deposition testimony that he wanted to clarify Plaintiff's job duties and the level of responsibility expected of her because it seemed to him that Plaintiff was unhappy with her workload. (*Id.*)

On September 8, 2004, prior to going to work, Plaintiff submitted an intake form with the New York Division of Human Rights regarding her complaints. (*Id.* ¶ 91.)

On or about September 8, 2004, a meeting was held among Plaintiff, King, Nervik, Bettencourt, and Harms. (*Id.* ¶¶ 92-93.) Also attending were Steve Greenberg, a union steward; Robert Hanaburgh, the head of the union; Cassandra Krikelis, Plaintiff's daughter; and an Aramark intern. (*Id.* ¶ 93.) During this meeting, Plaintiff raised her concerns about her workload. (*Id.* ¶ 95.) Nervik criticized Plaintiff's stress management, job performance, and workplace responsibilities. (Pl.'s 56.1 ¶ 96.) In response, Plaintiff said that King was discriminating against her for not paying her for Assistant Chef's work when King had so paid a similarly-situated male employee. (*Id.* ¶ 97.) Plaintiff said that Nervik was sexually harassing her in the kitchen, and she accused Nervik "of verbal and physical harassment, removing her recipes, hiding her carts, changing her menus, turning up her ovens, and hugging her." (Defs.' 56.1 ¶ 98; Pl.'s 56.1 ¶ 97.) Plaintiff also accused Bettencourt of retaliating against her and threatening her with unwarranted disciplinary action. (Defs.' 56.1 ¶ 102.)

Following the meeting, King encountered Plaintiff and Plaintiff's daughter outside the meeting room. (*Id.* ¶ 108.) King told them she had spoken with Nervik and told him to stay away from Plaintiff and that she would be contacting Vassar Associate Director of Human Resources Kim Collier ("Collier"). (*Id.*) King testified at her deposition that she did call Collier and suggested that Plaintiff's complaint be referred to Vassar Affirmative Action Officer Belinda

Guthrie ("Guthrie").  (*Id.* ¶ 110.)  In addition, King posted a memo on bulletin boards (later reinforced at an employee meeting in January 2005) that there was to be no touching in the kitchen or workplace, not even friendly touching or hugging.  (*Id.* ¶ 110.)

### v.  Vassar Investigation

Collier has given deposition testimony that, following her conversation with King on September 8, she interviewed Nervik and then sought to interview Plaintiff, who declined to meet with her.  (*Id.* ¶¶ 112-16.)

On or about September 22, 2004, Plaintiff sent a registered letter requesting investigation of her harassment allegations to Vassar Director of Human Resources Sarah Hoger ("Hoger").  (*Id.* ¶ 130.)  On or about September 23, 2004, Guthrie sent Plaintiff a letter requesting additional information about Plaintiff's allegations.  (*Id.* ¶ 135.)  In the letter, Guthrie told Plaintiff that more "specific information about incidents which you perceive to be discriminatory or harassing" would be required and told Plaintiff that, to proceed, she should "please schedule an appointment with me or file a written complaint with the EO/AA office within 60 days of the last date of the alleged incidents of discrimination or harassment."  (*Id.* ¶ 136.)  On September 24, 2004, Hoger telephoned Plaintiff and advised her to speak with Guthrie to provide additional information about her complaints.  (*Id.* ¶ 138.)  Plaintiff gave deposition testimony and stated in her affidavit that she did not want to deal with Guthrie because she did not trust her based on prior dealings with her, and that Plaintiff told Hoger this during their phone call.  (Pl.'s 56.1 ¶¶ 137-39.)  In any event, Plaintiff had no further communication with Hoger and did not contact Guthrie.  (Defs.' 56.1 ¶ 140.)

### vi.  Nervik's Transfer

Plaintiff has alleged that she faced discrimination and harassment through approximately April 2005, when Nervik moved to a different shift from Plaintiff.  (*Id.* ¶ 147.)  In August 2005, Bettencourt transferred out of Vassar to a different Aramark location.  (*Id.*)

### B.  Procedural History

Plaintiff filed her complaint with the New York State Division of Human Rights on November 18, 2004.  (Dkt. No. 14, Ex. 8.)

Plaintiff filed her Complaint in federal court on June 2, 2006.  Defendants contend that Plaintiff's suit is untimely for having been filed later than ninety days following receipt of an EEOC Right-to-Sue Notice and should therefore be disposed of on jurisdictional grounds.  *See* 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117(a).  Defendant Vassar moved for summary judgment to this effect on October 23, 2006, and Aramark similarly moved to dismiss on October 27, 2006.  In addition, Aramark argued that it was not Plaintiff's employer and therefore not subject to Title VII or to the ADA.  Judge Colleen McMahon, to whom this case was initially assigned, denied both motions by orders dated March 22, 2007.  With respect to Defendants' timeliness claim, Judge McMahon concluded that the issue of when Plaintiff had received the EEOC Right-to-Sue Notice should be submitted to a jury.  With respect to Defendant Aramark's defense that it was not her employer, Judge McMahon issued a Decision and Order denying the motion without prejudice, on theory that the Motion was premature to determination of the factual issue of whether Aramark was Plaintiff's joint employer.  (Dkt. No. 37.)

Meanwhile, Defendants jointly moved for summary judgment on February 23, 2007, meeting a deadline set by Judge McMahon.  On August 6, 2007, the case was reassigned to this Court, which held oral argument on the Motion on February 15, 2008.

A.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view all evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in th non-movant's favor.  *See Tufariello v. Long Island R.R.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006).  Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."  *Salahuddin v. Goor*d, 467 F.3d 263, 273 (2d Cir. 2006).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v. N.Y. City Transit*

*Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006).  A court's goal should be to "isolate and dispose of factually unsupported claims."  *Celotex Corp.*, 477 U.S. at 323-24.

Courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) ("[A]n extra measure of caution is merited in . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.")  Nevertheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "'treat discrimination differently from other ultimate questions of fact,'"  *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000)).

B.  Disability Discrimination Claims

The Complaint alleges that Defendants discriminated against Plaintiff in violation of the Americans with Disabilities Act ("ADA") and the New York Human Rights Law ("NYHRL") on the basis of Plaintiff's diabetes and coronary disease.  (Compl. ¶¶ 8, 27.)  Plaintiff abandoned the coronary disease claim in the briefing and acknowledged at oral argument that only the diabetes claim remains.  Thus, the Court will address only the diabetes claim.

A *prima facie* case of discrimination under the ADA includes the following:  "(1) the

12

defendant is covered by the ADA; (2) the plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) the plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability or perceived disability." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).

Of the *prima facie* case, Defendants contest only the second prong, claiming that Plaintiff's diabetes does not amount to a disability under the ADA. (Defs.' Mem. of Law at 9; Defs.' Reply Mem. of Law at 3.) The Supreme Court has held "that the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 475 (1999). As a result, Plaintiff faces an uphill battle to raise a triable issue of fact that her case of diabetes is a covered disability. *See id.* at 483-84 (stating that it would be "contrary to both the letter and spirit of the ADA" to cover a "diabetic whose illness does not impair his or her daily activities" on the theory that "if [she] failed to monitor [her] blood sugar levels and administer insulin, [she] would almost certainly be limited in one or more major life activities"); *Schaefer v. State Ins. Fund*, 207 F.3d 139, 143 (2d Cir. 2000) (vacating denial of summary judgment and remanding in light of *Sutton* to determine if Plaintiff had raised a triable issue of fact as to whether her "Type II" diabetes was an ADA-covered disability); *Teachout v. N.Y. City Dep't. of Ed.*, No. 04-CV-945, 2006 WL 452022, at *5 (S.D.N.Y. Feb. 22, 2006) (holding that plaintiff had not raised a triable issue of fact as to impairment of eating as substantial life activity where his diabetes required him to eat regular and small meals); *Sepulveda v. Glickman*, 167 F. Supp. 2d 186, 191 (D. P.R. 2001) (holding that plaintiff with diabetes requiring "medication, a fixed meal schedule, timely snack breaks, and the opportunity to use the bathroom frequently during the work day" is not

limited as to any major life activity when "taking into account the availability of corrective and mitigating measures").

Nevertheless, as it must, the Court examines Plaintiff's arguments that *her* particular case of diabetes is an ADA-covered disability. Under the ADA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" or "(B) a record of such an impairment;" or "(C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff has raised arguments that she has a covered disability only under the first prong. (Pl.'s Mem. 23-24.) This question – that is, whether the disability poses a substantial limitation on the major life activity – requires an "individualized and fact-specific" examination. *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998).

Plaintiff claims that her condition substantially limits her ability to engage in the major life activity of eating. (Pl.'s Mem. at 24.) The law of this Circuit is that "eating" is a major life activity. *See Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999) (stating that "major life activities" include eating). Yet, Plaintiff has cited only a case from the Seventh Circuit to support her claim that she has raised a triable issue of fact that her diabetes poses a substantial limitation on eating. In *Lawson v. CSX Transportation Inc.*, the court held that it was the "severity of [plaintiff's] limitations on his ability to eat that distinguishes [his] situation from that of other individuals who must follow the simple 'dietary restrictions' that medical conditions sometimes entail." 245 F.3d 916, 924-25 (7th Cir. 2001). Even if *Lawson* were binding authority on this Court – which it is not – Plaintiff still has not raised a triable issue of fact because, by her own admission, her "diabetes can be controlled by medication and regular meals." (Pl.'s Mem. 13; Krikelis Aff. ¶ 12.) This is precisely the type of

case that *Lawson* distinguished as not amounting to a substantial limitation on eating as a matter of law. *See Lawson*, 245 F.3d at 925 (describing *Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1001-02 (S.D. Tex. 1997) as stating that "person who managed non-insulin-dependent diabetes with oral medications and 'a normal, good, healthy diet' with meals 'at regular intervals' was not substantially limited in eating"). Under the precedent within the Second Circuit, it is the nature of the ordinary limitations – not the severity of the consequences if a plaintiff fails to follow necessary treatment – that determines whether a limitation on a major life activity is substantial. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871 (2d Cir. 1998) ("We find that although [Plaintiff's ailment] is a permanent affliction, the fact that it is asymptomatic for long periods, and varies in intensity, weighs against a finding of substantial limitation."); *Teachout*, 2006 WL 452022 at *5 ("[Plaintiff's] dietary restrictions, unaccompanied by any impairment to his ability to eat and digest food, simply do not rise to a substantial level." (internal quotation marks omitted)); *Shields v. Robinson-Van Vuren Assocs.*, No. 98-CV-8785, 2000 WL 565191, at *4-5 (S.D.N.Y. May 8, 2000) (finding that dietary modification required to control Plaintiff's diabetes mellitus does not constitute a restriction on the activity of eating and noting that it is the nature of the *limitation* that is at issue); *accord Land v. Baptist Med. Ctr.*, 164 F.3d 423, 425 (8th Cir. 1999) (affirming summary judgment on basis that child with potentially life-threatening peanut allergy was not severely-limited in life activity, although consequences of failing to control food intake for nut contamination could include death). As a matter of law, Plaintiff's limitations on eating are not sufficiently substantial so as to be covered under the ADA.

Additionally, Plaintiff claims to be entitled to relief for her diabetes under the NYHRL. "The NYHRL definition of disability is construed more broadly than under the ADA and does

not impose the requirement that the impairment substantially limit the individual's normal activities." *Harewood v. Beth Israel Med. Ctr.*, No. 02-CV-5511, 2003 WL 21373279, at *6 (S.D.N.Y. June 13, 2003) (internal quotation marks omitted); *see also Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 155-56 (2d Cir. 1998) (holding that federal courts must apply New York Court of Appeals construction of NYHRL, which is broader than ADA, and requires only an "impairment" that is "demonstrable by medically accepted clinical or laboratory diagnostic techniques"). The Parties did not brief whether Plaintiff's condition is a cognizable disability under the NYHRL, but the Court finds that at least a triable issue of fact has been raised on the matter. *See Epstein v. Kalvin-Miller Int'l, Inc.*, 100 F. Supp. 2d 222, 229-30 (S.D.N.Y. 2000) (holding plaintiff's Type II diabetes "even as treated" to be NYHRL-covered medical disability).

The NYHRL requires an employer to "provide reasonable accommodations to the known disabilities of an employee in connection with a job . . . held." N.Y. Executive Law § 296(3)(a) (McKinney 2008). The term "reasonable accommodation" is defined as those employer actions that "permit an employee . . . with a disability to perform in a reasonable manner the activities involved in the job . . . held . . . provided, however that such actions do not impose an undue hardship on the business. . . ." *Id.* § 292(21-e).[2] The NYHRL "reasonable accommodation" requirement parallels that imposed by the ADA, and so the Court appropriately looks to the latter for guidance. *See Lovejoy-Wilson v. NOCO Moto Fuel, Inc.*, 263 F.3d 208, 212 n.3 (2d Cir. 2001).

---

[2] This is a change in the New York law effective January 1, 1998; many older cases note that the NYHRL did not require employers to reasonably accommodate the known disabilities of employees. *See* Sharon P. Stiller, 13A N.Y. Practice, Employment Law in New York § 4:169 (2007).

The reasonable accommodation dispute boils down to whether Defendants' allowing Plaintiff to eat at her workstation when necessary was a reasonable accommodation in light of the doctor's letter that Plaintiff provided to her manager or whether, as Plaintiff asserts, Defendants were required under the law to give her a "full break" at 6 p.m. Defendants assert that the law does not require them to accommodate an employee's specifications but only to provide a *reasonable* accommodation. Indeed, the Second Circuit has held that an employer is not required "to provide every accommodation a disabled employee may request, as long as the accommodation provided is reasonable." *Fink v. N.Y. City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995). In Defendants' view, they offered Plaintiff a reasonable accommodation in response to her doctor's note; the burden then shifted to Plaintiff to produce some further indication (such as another, more specific doctor's letter) that she required something more. As Defendants point out, reasonable accommodation is "an informal, interactive process . . . [which] should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 511 (N.D.N.Y. 2004) (internal quotation marks omitted) (alteration in original); *see also Lovejoy-Wilson*, 263 F.3d at 218; *Pimentel v. Citibank N.A.*, 811 N.Y.S. 2d 381, 387 (App. Div. 2006). According to Defendants, it was Plaintiff who caused this interactive process to collapse.

The doctor's note produced by Plaintiff is succinct. In its entirety, it reads: "Arlene is being treated for diabetes[;] she has been advised to take dinner at 6 p.m." It is undisputed that Defendants did offer Plaintiff accommodation in light of this letter by allowing her to eat while on the food line. Plaintiff argues, however, that the only reasonable accommodation was to allow Plaintiff "to eat a balanced meal at a specific time (6:00 p.m.) as opposed to getting a quick bite during working hours." (Pl.'s Mem. 23.) Although Plaintiff views the

accommodation offered as insufficient for her condition, the relevant legal question is whether it was a reasonable accommodation as part of the interactive process in light of Plaintiff's contributions to that process. The Court finds, based on undisputed facts, that Defendants' offer of accommodation was reasonable as a matter of law.

Plaintiff produced a note saying that she needed to be able to eat at 6 p.m. Her managers granted her permission to do that. Plaintiff insisted she required something more: a full break, with relief coverage, at what Plaintiff does not dispute was a peak operating time for Defendants' business.[3] At oral argument, Plaintiff's counsel elucidated a clear difference between the accommodation offered by Defendants and that demanded by Plaintiff. Nevertheless, given Defendants' response to Plaintiff's doctors note, Plaintiff was required to produce something more – a further doctor's note, a written explanation of the insufficiency of the offered accommodation – before Defendants' could be required by law to revise the offered accommodation. *See Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1999) (affirming summary judgment where accommodation offered was "plainly reasonable" although not the accommodation plaintiff sought). To make any other finding would entirely defeat the

---

[3] This specific time "was an extremely busy time of day for student dining and accordingly not a typical dinner break time for employees." (Defs.' Mem. 10; Defs.' 56.1 ¶ 85.) This is not to say that granting the full break Plaintiff requested was impossible – clearly it was not, given that Defendants did grant Plaintiff such a full break in August 2006. But Defendants have produced a sensible business rationale for hesitating to give Plaintiff exactly what she sought. *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) ("'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well."). A showing by Defendants that Plaintiff's requested accommodation appeared disproportionately costly to its benefits suffices in this instance to show that Defendants offered reasonable accommodation. *See Matos v. MTA Bridges & Tunnels*, No. 04-CV-768, 2008 WL 858995, at *5 (E.D.N.Y. Mar. 31, 2008) ("The employer's burden is to engage in a cost/benefit analysis to demonstrate the unreasonableness of the suggested accommodation.").

axiom that an employer is required only to provide reasonable accommodation and not every accommodation that an employee may request. *See Cave v. E. Meadow Union Free Sch. Dist.*, 480 F. Supp. 2d 610, 640-41 (E.D.N.Y. 2007) (collecting cases).

For the foregoing reasons, summary judgment for Defendants is GRANTED as to Plaintiff's disability discrimination claims under each of the ADA and the NYHRL.

### C. Gender-Based Pay Discrimination Claims

Plaintiff articulates a theory of Title VII-cognizable pay discrimination based on her gender running from her promotion to the position of Cook in October 2001. (Pl.'s Mem. 1.) As Plaintiff presents the facts, it was only "[i]n 2004 [that] plaintiff inadvertently learned" of the alleged pay disparity. (*Id.* at 2.)

In May 2007, after this Motion was fully briefed, the Supreme Court decided *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007). In *Ledbetter*, the Court held that "[b]ecause a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs." *Id.* at 2165. In light of *Ledbetter*'s apparent applicability to this case, the Court asked Parties to prepare for oral argument with particular attention to it.

Plaintiff conceded at oral argument that most of Plaintiff's pay discrimination claim is extinguished as untimely in light of *Ledbetter*. Plaintiff maintained, however, that an action still lies for pay differential from late 2004, when Plaintiff conveyed to Dalton her belief that she should be paid at the rate of an Assistant Chef, until she was promoted to Assistant Chef in 2005 following her filing of a union grievance.

Defendants urged the Court to look to the definition of discrete acts in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and to *Morgan*'s post-*Ledbetter* interpretation in cases such as *Al-Haideri v. Trs. of Columbia Univ.*, No. 07-CV-106, 2007 WL 2187102

19

(S.D.N.Y. July 26, 2007). *Morgan* teaches that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify [and each] constitutes a separate actionable 'unlawful employment practice.'" 536 U.S at 114. *Ledbetter* provides that paychecks issued within the proper period prior to the filing of an EEOC charge cannot provide the basis for challenging an allegedly discriminatory pay-setting decision that took place prior to the statutory period. 127 S. Ct. at 2169. But *Ledbetter* also speaks directly to Plaintiff's point: "a freestanding violation may always be charged within its own charging period regardless of its connection to other violations." *Id.* at 2174. Defendants' own statement of facts provides that in late 2004, King "denied Plaintiff's request to be paid at an Assistant Chef's rate." (Defs.' 56.1 ¶ 82.) Nothing in *Morgan* or *Ledbetter* contradicts the basic observation that this was a discrete act.[4]

But Plaintiff must ultimately produce evidence that King's 2004 decision was itself improperly gender-discriminatory. Plaintiff cannot, in light of *Ledbetter*, seek to impute alleged prior acts of discrimination into the discrete employment decision that falls within the statutory time to act. There is very little to go on in Plaintiff's briefing to suggest that King's 2004 decision was based on gender discrimination.

Nevertheless, in light of the related evidence introduced by Plaintiff in alleging gender discrimination in her workplace, and further in light of the fact that this Motion was briefed prior to *Ledbetter* shaping the focus on the 2004 determination, the Court cannot find now that no reasonable trier of fact could deem King's 2004 determination to be a pay-setting decision based

---

[4] *Al-Haideri* is distinguishable because all such acts in that case occurred prior to 300 days before the filing of that plaintiff's complaint. 2007 WL 2187102 at *2. Indeed, *Al-Haideri* states that "denials of promotions and pay raises" are precisely the kind of "discrete acts" covered by anti-discrimination statutes. *Id.*

on prohibited grounds.  Plaintiff has a steep, steep uphill climb in proving this point, but foreclosing Plaintiff's claim by summary judgment would be improper at this stage.  On this issue therefore, summary judgment is denied without prejudice to Defendants' renewal of the motion with full briefing to take place in light of *Ledbetter*.

### D.  Gender-Based Harassment Claims

Defendants seek summary judgment on Plaintiff's sexual harassment claim on the grounds that there is no triable issue of fact regarding:  (1) the existence of an actionable hostile work environment; or (2) a specific basis for imputing liability to Defendants.  (Defs.' Mem. 13-21.)

To maintain a hostile work environment claim, Plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents [was] 'sufficiently continuous and concerted' to have altered the conditions of her working environment.'"  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *accord Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993).  The Supreme Court has "set forth a non-exclusive list of factors" to consider, including "'the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating, or a mere offensive utterance . . . .'"  *Raniola v. Bratton*, 243 F.3d 610, 620 (2d Cir. 2001) (quoting *Harris*, 510 U.S. at 23).  The test is at bottom one of "totality of circumstances," *Meritor*, 477 U.S. at 69, within which a court is to look at "the quantity, frequency, and severity of the incidents" in order to "obtain a realistic view of the work environment," *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (internal quotation marks omitted) (abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2414 (2006)).  Further, the Second Circuit has reminded district

courts that "'the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'"  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Richardson*, 180 F.3d at 439).

Here, Plaintiff has put forth a long list of allegedly offensive workplace conduct, principally the speech and actions of Nervik, that she claims amount to a hostile work environment.  (Pl.'s Mem. at 3-6.)  Several of these alleged actions are clearly gender-based and offensive, most notably Nervik's alleged statement that "[y]ou are the woman and I am the man and you will do as I say."  (Pl.'s 56.1 ¶ 39.)[5]  In light of the Second Circuit's clear guidance that the existence of a hostile work environment is a mixed question of fact and law, the Court cannot say that this is one of those "cases in which it is clear to . . . the trial court . . . that after assessing the frequency of the misbehavior measured in light of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim."  *See Schiano,* 445 F.3d at 608.

Defendants' second asserted ground for summary judgment is that Plaintiff lacks a specific basis for imputing liability to Defendants.  The Second Circuit has explained that "[w]here an employee is the victim of . . . a hostile work environment [created by] by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004).

Here, Plaintiff has alleged facts that, if credited by a finder of fact, might show that Nervik's mistreatment of her was open and notorious and that Aramark and Vassar managers

---

[5] At oral argument, counsel to Defendants tried to argue that this statement was not evidence of gender bias.  The Court is not persuaded.

had specific notice on which they failed to act. (Pl.'s Mem. 5-11.) Under the precedent of the Second Circuit, a trial court must deny summary judgment where a jury might find that harassment continues even after complaints are made. *See Whidbee*, 223 F.3d at 72 ("[W]e have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate.")

A jury may well find that the conduct of Plaintiff's coworkers was not so severe and pervasive as to create a hostile work environment; it may also find that Defendants' reactions were reasonable. At the summary judgment stage, however, all facts are viewed in the light most favorable to the nonmoving party. Because a reasonable jury could find a hostile work environment and could impute it to Defendants, summary judgment on Plaintiff's gender-based harassment claims is denied.

E. Retaliation Claims

Defendants seek summary judgment on Plaintiff's retaliation claim on the grounds that there is no triable issue of fact as to whether: (1) Plaintiff engaged in a protected activity; (2) any such activity caused an adverse employment decision; and (3) even if a prima facie case was shown, Defendants' legitimate reason for changing the menus was non-pretextual. (Defs.' Mem. 21-25.)

"To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (internal quotation marks omitted); *accord Wilson*, 2005 WL 2385866, at *16 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

Plaintiff has raised a triable issue of fact with respect to engaging in a protected activity because she has introduced evidence that she complained of Nervik's conduct to Harms in May 2004, as discussed above with respect to her gender-based harassment claims. (Defs.' 56.1 ¶ 57.)

Plaintiff survives summary judgment – albeit, just barely – as to the required causal connection between the protected activity and the employment decision complained of here. Plaintiff claims that Terri Bettencourt ("Bettencourt") retaliated against Plaintiff for her complaints about Donald Nervik by "unreasonably alter[ing] plaintiff's workload and singl[ing] her out for work assignments." (Pl.'s Mem. 20.) An increase of workload disproportionate to similarly-situated employees can constitute an adverse action. *See Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004). Defendants rebut Plaintiff's claim by asserting that Plaintiff has not put forward any evidence that Bettencourt even knew about Plaintiff's May 2004 complaint. (Defs.' 56.1 ¶ 74; Pl's 56.1 ¶ 74.) But Plaintiff has introduced enough evidence about the general knowledge of her protected activities that a jury could reasonably infer that Bettencourt was aware of her complaints to management.

As to the last ground asserted for summary judgment, Defendants have indeed presented a legitimate, non-retaliatory reason for the broader menu revision that Plaintiff complains was directed against her. (Defs.' 56.1 ¶¶ 62-69.) Defendants have explained – and Plaintiff has not disputed – that menu changes are necessary "because of student complaints about the food" and because "it is important to maintain variety and introduce new food items each semester in order to accommodate student preferences." (*Id.* ¶ 63.) But Plaintiff has produced evidence that a jury could credit so as to find that Plaintiff's workload was disproportionately increased by Bettencourt as part of these changes. (Pl.'s 56.1 ¶¶ 69, 72.)

Therefore, summary judgment for Defendants on the retaliation claim is denied.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted to Defendants on the disability discrimination claims under each of the ADA and the NYHRL. Summary judgment is denied without prejudice on the gender-based pay discrimination claim. Summary judgment is denied on the gender-based harassment and retaliation claims.

The Clerk of Court is respectfully directed to terminate the pending motions.

SO ORDERED.

Dated:     August ⊐, 2008
           White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

Service List by ECF

Helen G. Ullrich, Esq.
Bergstein & Ullrich, LLP
15 Railroad Avenue
Chester, NY 10918
hullrich@frontiernet.net

Vincent P. D'Andrea, Esq.
Donoghue, Thomas, Auslander, & Drohan
700 White Plains Road
Scarsdale, NY 10583
vdandrea@dtad.net

William J. Delany, Esq.
Jill Barbarino, Esq.
Anne E. Martinez, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
wdelany@morganlewis.com
jbarbarino@morganlewis.com
aemartinez@morganlewis.com